IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JANET M. COLEMAN,

                Plaintiff,                    OPINION AND ORDER

  v.

                                             17-cv-63-wmc

CITY OF WAUSAU,

                Defendant.

---

*Pro se* plaintiff Janet Coleman filed suit against her former employer, the City of Wausau, claiming discrimination based on race, sex, age, and religion, as well as claims for a hostile work environment and retaliation. Plaintiff further asserts claims for violation of her due process rights arising out of her termination. Before the court is defendant's motion for summary judgment as to all of these claims, except as to denial of due process. (Dkt. #10.) While plaintiff submitted a brief in opposition to defendant's motion, she cites no specific, admissible evidence contradicting defendant's proposed facts, choosing instead to rely on her complaint, which is not verified (sworn to as true under penalty of perjury).[1] She also did not submit an affidavit or declaration setting forth her personal knowledge. Despite the court's specific warnings in the preliminary pretrial conference order (*see e.g.*, dkt. #9 at 7) as to the consequences and defendant's reliance thereon (*see* dkt. #17 at 1), this court would normally accept the factual assertions in a *pro se* plaintiff's

---

[1] Plaintiff's opposition brief consists of three pages of legal argument with no factual assertions.

complaint as her own to the extent conceivably based on personal knowledge.[2] In this case, the result is the same even if plaintiff had submitted a sworn statement detailing the allegations contained in the complaint. Accordingly, defendant's motion will be granted.

Although the City did not formally move against plaintiff's due process claims, there also appears to be no factual or legal basis for them. Accordingly, plaintif will be given until July 11, 2018, to advise why the court should not also grant summary judgment on her remaining due process claims consistent with Fed. R. Civ. P. 56(f).

UNDISPUTED FACTS[3]

A. Coleman's Employment with Metro Ride

Plaintiff Janet M. Coleman is 59-year-old, African American woman, who worked as a bus operator for the City's Metro Ride subdivision. Metro Ride provides public transit within the city and surrounding area. Coleman was hired in November of 1999 and fired on June 3, 2014. (Coleman Dep. (dkt. #14) 19:9-11.) During her employment, she was the only African American woman employed by Metro Ride and one of the older employees. Her direct supervisor was Steve Brinkman, who is Caucasian.

---

[2] Defendant's reply brief curiously discusses and argues for strict application of the *Eastern* District of Wisconsin's Local Rules. (Reply (dkt. #17) 2-4.) While this court's summary judgment procedures are in some aspects similar to the Eastern District's local rules, however, as recognized by defendant, the Seventh Circuit leaves it to each district's discretion whether to impose sanctions for failing to follow local procedures. *See Hedrich v. Bd. of Regents of Wis. Sys.*, 274 F.3d 1174, 1177 (7th Cir. 2001) (concluding that plaintiff "did indeed violate the local rules and that *the court was within its discretion* to impose the sanctions that it did" (emphasis added)).

[3] These facts are mainly drawn from defendant's proposed findings of fact (dkt. #12), which were not responded to by plaintiff. "A fact properly proposed by one side will be accepted by the court as undisputed unless the other side properly responds to the proposed fact and establishes that it is in dispute." (Prelim. Pretrial Conference Order (dkt. #9) 15.) Consistent with the discussion above, however, the court has also considered allegations contained in plaintiff's *pro se* complaint and statements in her deposition testimony.

As a bus operator, Coleman's main task was to drive a public bus safely along the bus route, making scheduled stops along the way, while complying with traffic regulations and Metro Ride policies. (Job Description (dkt. #13-2) 2.) In addition to having a Wisconsin commercial driver's license, Coleman was expected to be "punctual, reliable and maintain regular attendance in order to contribute individually to the efficient and effective delivery of transportation service to the general public." (*Id.* at 2-3.) These requirements are consistent with Metro Ride's need to provide punctual and reliable service to its customers or risk loss of business and ultimately operational failure. (*See* Burek Aff. (dkt. #13) ¶ 23.) The importance of reliable and punctual services is highlighted by the fact that passengers frequently transfer from one bus to another, with each transfer often being time-sensitive. (*See id.*)

From January 2010 through June 2014, Metro Ride issued 34 formal reprimands to bus operators for tardiness or being absent without permission. (Discipline Review Chart (dkt. #13-25) 2-3.) Of these, 16 received verbal reprimands, 9 received written reprimands, and 9 received suspensions. (*Id.*) The employees who received these disciplinary actions fit the following demographics: 12 white men, 1 black man, 1 white woman, and 1 black woman (Coleman). (*Id.*) Coleman received the most -- seven -- reprimands for being tardy; a white man, Adrian Rinehart-Balfe received five; and the other individuals listed each received no more than three reprimands. (Discipline Review Chart (dkt. #13-25) 2-3.)

Bus drivers are covered by a collective bargaining agreement between Local 1168, Amalgamated Transit Union (the "Union") and the City. (Burek Aff. (dkt. #13) ¶ 10; *see also* Coleman Dep. (dkt. #14) 77:10-12.) That CBA gives management "the sole right to

3

operate its operations," including to discipline or discharge "for just cause," to "take whatever action [is] necessary to comply with State and Federal Law," and to "establish work rules." (CBA (dkt. #13-6) 6-7.)

The rules governing the bus operator position are outlined in the Metro Ride Operator's Manual and Discipline Guide, which is given to each employee at hiring and with each update. The most recent version of the Discipline Guide leading up the events in this case was distributed in April 2010. When four or more violations occur within six months, the Operator's Manual explains that the employee is subject to a written reprimand or suspension on the fourth offense and to suspension or dismissal on the fifth. (Discipline Guide (dkt. #13-5) 4.)

Over the course of her 14½ year tenure, Coleman received 20 verbal reprimands, 18 written reprimands, and one suspension. (*See* Disciplinary History (dkt. #13-7) 1; Disciplinary History Pt. 2 (dkt. #13-8) 1; Disciplinary History Pt. 3 (dkt. #13-9) 1.) By April 2014, Coleman had received at least four reprimands within the prior six-month period and she was informed on April 23, 2014, that any additional formal reprimands before the middle of June would result in her termination. (*See* Coleman Dep. (dkt. #14) 36:14-18 (testifying that the "meeting was to address . . . the fact that [she] had . . . five occurrences within a six-month period, and that was grounds for termination").) Specifically, from the middle of December through the middle of April, Coleman received written or verbal reprimands for (1) failing to stop at a railroad crossing in violation of law, showing poor judgment; (2) failing to notice that the tail of her bus hit a disabled stationary vehicle; and (3) four instances of arriving to work late, ranging from one minute to twenty minutes late. (Disciplinary History (dkt. #13-7) 3; Disciplinary History Pt. 2 (dkt. #13-

4

8) 2-5; Disciplinary History Pt. 3 (dkt. #13-9) 2.) Coleman acknowledges that the discipline she received for coming in late was not discriminatory. (Coleman Dep. (dkt. #14) 60:4-10.)

Coleman received a final discipline -- resulting in her termination -- for failing to notify her employer that her commercial driver's license was suspended and then driving the bus six times with the suspended license. (Disciplinary History Pt. 3 (dkt. #13-9) 3, 5.) The Operator's Manual required employees "immediately" to report if "a C.D.L. is refused, revoked, suspended, or lost." (Operator's Manual (dkt. #13-4) § 2.02.) Coleman driving buses without the appropriate licensure exposed Metro Ride and the City to the risk of significant liability. (Burek Aff. (dkt. #13) ¶ 17.)

**B. Grievance Process**

Following her termination, Coleman met with her Union representative and inquired why she did not have representation, "how come the union ha[d]n't stepped in," why she "didn't have a chance to defend [her]self," and why she "didn't have a chance to give evidence or anything" before she was terminated. (Coleman Dep. (dkt. #14) 77:21-78:15.) The Union filed a grievance on her behalf on June 12, 2014, which the City denied six days later, noting that much of the dispute concerned the validity of the suspension of her commercial driver's license.[4] (*See* Grievance Step 1 (dkt. #13-14) 2, 5.) In part, the City relied on Coleman's statements during the grievance meeting, which confirmed her knowledge of the suspended license. (*Id.*) The Union then pursued "step 2" of the

---

[4] Specifically, Coleman maintained that her license was suspended because of her husband's actions, as well as the failure of a municipal court clerk to inform her about additional outstanding fines.

5

grievance process on June 25, 2014, which was denied on August 1, 2014. (Grievance Step 2 (dkt. #13-15) 4; Grievance Step 2 Pt. 2 (dkt. #13-16) 3.) The Union proceeded to "step 3," which required review by the City's Human Resources Committee, but that appeal was considered untimely. (*See* Grievance Step 3 (dkt. #13-17) 1.) The City also denied Coleman's grievance on the merits. (*Id.*) Almost a month later, on October 5, 2014, the Union "decided to not move the grievance onto Step 4." (Grievance Step 4 (dkt. #13-21) 1.) Coleman was at the Union meeting where the members voted against proceeding, which would have required the Union to provide her an attorney. (Coleman Dep. (dkt. #13) 95:24-96:25.)

C. **Coleman's Allegations**

The heart of Coleman's race discrimination claim dates further back to an incident from 2009, involving her bringing her bus into the garage.[5] The process of bringing a bus into the garage takes about three minutes. The parties disagree about *when* the driver needs to exit the bus: the City contends that the driver needs to get out to close the door, while Coleman contends that the driver needs to get out to open the door. According to the City, on one occasion in 2009, Coleman drove her bus into the garage and shouted to Steve Brinkman "Hey Steve, go close the door for me." He responded "If you're too lazy to get out and close it yourself, I'll do it, but don't order me to do it." (Burek Aff. (dkt. #13)

---

[5] In her deposition, Coleman also alleged "some problems with other coworkers when [she] began" working at Metro Ride; specifically that she felt "different" from her colleagues as an African American and also that a coworker's wife made offensive signs at Coleman while she drove her bus. (Coleman Dep. (dkt. #14) 25:9-20.) Finally, although not referenced in her complaint, Coleman noted an incident with a colleague, Richard Sternberg, who made some racially insensitive comments about her at some point. (*Id.* 106:2-108:25.)

6

¶ 29.)[6] According to Coleman, she was about to pull her bus into the garage when she saw Brinkman getting out of his car. He did not offer, so she asked him if he was going to open the door for her; he responded by calling her lazy and opening the door. (Coleman Dep. (dkt. #14) 44:8-25, 45:22-46:9, 47:3-4.) Coleman acknowledged that "lazy" is "not a racial comment" on its own, rather, she argues that it is reflective of "the mentality of some people about African American people, that they're just lazy people." (*Id.* at 46:10-13.)[7] The parties agree that Coleman complained to the Union, resulting in a meeting to address her concern and the comment. Brinkman received training and apologized to Coleman. (Burek Aff. (dkt. #13) ¶ 29.)

Because of this 2009 incident, Coleman claims that Brickman retaliated against her. Specifically, when she returned from leave after a slip and fall in February 2014, more than four years later, Coleman contends that Brinkman retaliated by ignoring and then yelling at her after she asked him for supplies while he was counting money. (Coleman Dep. (dkt. #14) 38:21-39:3, 39:11-15, 39:18-40:22, 42:17-43:8.) After complaining about Brinkman's behavior to a supervisor, Coleman was instructed to tell Peter Burek, the transit operations manager, which she did. (*Id.* 40:23-41:5.) Burek then purported to speak with Brinkman, who reported that he thought Coleman had asked something else. Regardless, Brinkman was not required to apologize. (*Id.* 41:6-42:4.) Explaining that Brinkman had "a reputation" for "picking on the black kids" riding his bus, "writing reports

---

[6] Burek's basis for his personal knowledge is not set forth in his affidavit. The court assumes that he would be able to lay an appropriate foundation if this case were to go to trial.

[7] Coleman "speculat[ed]" that "maybe [Brinkman] thought [she] was just an old lazy black lady." (Coleman Dep. (dkt. #14) 48:2-6.)

7

up on them and getting them kicked off the bus," Coleman also claims that Brinkman's behavior was racially motivated. (*Id.* 54:10-55:19, 56:23-57:14.)[8]

Coleman also complains that Brinkman monitored her job performance more closely than her colleagues' performance, and his scrutiny made her uncomfortable. (*See id.* 31:1-32:10.) When she complained to her Union representative, Coleman was advised to speak with Greg Seubert, the transit director. In an April 2014, meeting with Burek and Seubert, Coleman was informed that *they* had asked Brinkman to observe her because of a complaint that she started late. (*See* Compl. (dkt. #1) 4.) Coleman's colleagues typically arrived for sign-in at 1:45 p.m., while Coleman was typically the last to report, often arriving at 1:50 on the dot.[9] (Burek Aff. (dkt. #13) ¶ 25; Compl. (dkt. #1) 4 ("I would report for my position at the start time and not before." (capitalization altered)).) Coleman would clean her bus before taking it out, making her miss the shuttle, so that she needed to drive a bus up to her route to arrive on time. (*See* Coleman Dep. (dkt. #14) 60:19-63:2.) Coleman acknowledged that Brinkman did not like her. (*Id.* 54:7-9.)

Coleman also questions whether religious discrimination contributed to her termination based on a complaint Metro Ride received in August 2013, concerning a

---

[8] Coleman faces a number of hurdles in introducing this evidence at trial. Since her "knowledge" of Brinkman's reputation appears to be based solely on statements by one teacher and one student (*see* Coleman Dep. (dkt. #14) 57:24-58:8.), she may not even meet the hearsay exception under Rule 803(21) (Reputation Concerning Character). An even larger bar to admission is that this character evidence ran afoul of Rule 404(b) as proof of propensity. Notwithstanding that it may also show Coleman's state of mind, its relevance to Brinkman's interactions with Coleman, a fellow employee, is likely outweighed by the unfair prejudice it would instill.

[9] Coleman was one of four bus operators who worked a "split-shift," meaning that she worked from 6:20–11:05 a.m. and then from 1:50–6:35 p.m. Upon reporting for the second half of the shift, employees signed in and then boarded a shuttle to the transit center at 1:53 p.m. (Burek Aff. (dkt. #13) ¶ 25.) The supervisor would perform an "eyes on" inspection to ensure all drivers were fit for duty on arrival. (*Id.*)

conversation she had with someone on her bus about marriage, with references to the bible. (Compl. (dkt. #1) 6 ("Now I've lost my position, so that puts me in a position to ask the question did my view on the bible an[d] marriage contribute to my termination?" (capitalization altered)).) While Coleman alleges that this conversation was with a friend and concerned the friend's impending marriage, the parties agree that a complaint *was* made about this bus conversation.[10] Moreover, Coleman contends that Burek complained about her reportedly "preaching" during the conversation, while Coleman was merely "exercising a religious right on . . . city transportation." (*Id.* 73:22-74:10.) Coleman further alleges that the resulting discipline she received is part of why she was fired, but that is contradicted by her disciplinary file. (*Compare* Coleman Dep. (dkt. #14) 75:15-17 ("Q: So it's part of the reason for your termination; correct? A. Part of my reason for termination.") *with* Disciplinary History Pt. 3 (dkt. #13-9) 5 (noting that the discipline on June 3, 2014 for failing to report her suspended license "will be your sixth (6) formal discipline in less than six months") and *id.* at 7 (showing "Improper or Unnecessary Conversation with Passenger" in August as the eighth disciplinary action).)[11]

---

[10] Coleman explained in more detail than would likely come in as evidence that she was friendly with the passenger (Gina), the passenger's fiancé (Ray), and the fiancé's ex-wife (Janine). She knew that Ray was a sex offender. (Her testimony is unclear as to specifically *how* she knew that, except that someone else apparently found out and made it known, possibly on the bus at an earlier time.) She adds that the reason the conversation came up is because she saw Gina walking with a little girl and was concerned about Ray's sex-offender status. Coleman contacted Ray's ex-wife to ask about his contact with children. Janine made a report, which led to an investigation, and eventually to someone (Coleman suspects Ray) calling Metro Ride to complain about Coleman's comments on the bus.

[11] Coleman also alleges that another Jehovah's Witness employee, Pau Yang or Pau Chang, was "treated differently," though provides no specifics as to who within the City did this, what they did, when or why. (*See* Coleman Dep. (dkt. #14) 117:5-17.) Without more, this evidence is, if anything, even weaker and more tangential as proof for the trier of fact to infer a discriminatory motive, than the evidence concerning Brinkman.

9

Finally, plaintiff also alleges that about a year after she began working, a mechanic smacked her rear; she went to management and was informed it was addressed. (Coleman Dep. (dkt. #14) 26:14-27:4.)

OPINION

Summary judgment is appropriate where the moving party establishes "that there is no genuine dispute as to any material fact," and it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A nonmoving party with the burden of proof cannot "merely allege the existence of a factual dispute to defeat summary judgment," rather "[s]he must supply evidence to allow a jury to render a verdict in her favor." *McPhaul v. Bd. of Com'rs of Madison Cty.*, 226 F.3d 558, 563 (7th Cir. 2000) (internal citations omitted) (finding plaintiff had failed to establish a *prima facie* case because she had failed to offer evidence suggesting discrimination because of her race), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013). For the reasons discussed below, no reasonable factfinder could conclude on this record that: (1) plaintiff was discriminated against on the basis of her race, religion or sex; (2) she was retaliated against for opposing discrimination; or (3) she was subjected to a hostile work environment.

I. **Discrimination**

Plaintiff's central allegation is that she was discriminated against based on her race (Coleman Dep. (dkt. #14) 20:6-11), but she also alleges discrimination based on religion,

sex, age and disability.[12] Contrary to defendant's assertion (Reply (dkt. #17) 5), plaintiff has pleaded "an equal protection claim" by claiming discrimination under the Equal Protection Clause and § 1983 under *Monell v. Dept. of Social Services of the City of New York*, 436 U.S. 658 (1978).[13] Traditionally, discrimination plaintiffs have marshalled their evidence to support a jury verdict of intentional discrimination through direct or indirect proof. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1975) (articulating burden-shifting framework sometimes referred to as the "indirect" method of proving employment discrimination). "Instead of separating evidence under different methods of proof," the Seventh Circuit recently affirmed that "'[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself -- or whether just the '"direct"' evidence does so or the '"indirect"' evidence.'" *Golla v. Office of the Chief Judge of Cook Cty.*, No. 15-2524, 2017 WL 5476342, at *3 (7th Cir. Nov. 15, 2017) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)) (affirming summary judgment on reverse race discrimination claim where plaintiff only put forward evidence that he was white and his better-paid colleague was African American). Still, the *McDonnell Douglas* framework may be useful. *Ortiz*, 834 F.3d at 766. Here, however, plaintiff has failed to put forward sufficient evidence under any method -- whether through

---

[12] Since plaintiff has put forward *no* evidence giving rise to discrimination against her based on age or disability, those claims will not be addressed further. Indeed, on these points, plaintiff only alleges that: (1) she was one of the older Metro Ride employees; (2) she had diabetes; and (3) she was criticized for taking too long in the restroom. Without more tying any of the facts together as a motivation for the City's adverse action, this is simply insufficient for a reasonable trier of fact to find discrimination on either basis.

[13] Moreover, whether plaintiff relies on Title VII or the Equal Protection Clause is a distinction without substance because the Seventh Circuit has held that "the same standards for proving intentional discrimination apply to Title VII and § 1983 equal protection." *Williams v. Seniff*, 342 F.3d 774, 788 n.13 (7th Cir. 2003).

a "convincing mosaic" or by direct/indirect proof -- to defeat defendant's motion.

To establish a prima facie case of discrimination under the *McDonnell Douglas* framework, plaintiff must show that:

> "(1) she is a member of a protected class, (2) she performed reasonably on the job in accord with her employer['s] legitimate expectations, (3) despite her reasonable performance, she was subject to an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably by the employer."

*David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017) (quotation marks and alteration in the original) (quoting *Andrews v. CBOCS West Inc.*, 743 F.3d 230, 234 (7th Cir. 2014).[14] Proof of these factors would ordinarily be sufficient for plaintiff to make a *prima facie* showing that "defendants treated her differently from others who were similarly situated," and that this differential treatment was "because of her membership in the class to which she belonged." *Hedrich v. Bd. of Regents of the Univ. of Wis. Sys.*, 274 F.3d 1174, 1183 (7th Cir. 2001). Once a plaintiff has made this showing, the burden shifts to the defendant to put forward a nondiscriminatory, legitimate reason for its actions. *Williams*, 342 F.3d. at 788. Finally, if the defendant has met this burden, plaintiff must demonstrate that the reasons offered were pretextual. *Id.*

Because plaintiff has failed to establish a *prima facie* case, however, the court need not proceed past her initial showing. The parties do not dispute that plaintiff falls into several protected classes: she is a woman; she is African American; she is over 50; she is a

---

[14] In the equal protection context, some cases require a fifth element to establish a *prima facie* case under the *McDonnell Douglas* framework -- that the defendant acted with discriminatory intent. However, the Seventh Circuit considers requiring such proof separately to be "redundan[t]." *Williams*, 342 F.3d at 788.

Jehovah's Witness; and she is diabetic. There can also be no dispute that she was subject to at least one adverse action: she was fired (and then not rehired).[15] As a result, defendant's motion turns on whether: (1) plaintiff was meeting her employer's legitimate expectations; and (2) she was treated worse than her similarly-situated colleagues. Since plaintiff did not identify *any* similarly situated colleagues outside her protected classes -- meaning that she has come forward *no* evidence demonstrating that defendant enforced its legitimate employment expectations disparately -- the inquiry ends there. *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 330 (7th Cir. 2002) (holding that plaintiff's "failure to offer such 'comparables' dooms her Title VII and ADEA claims").

While plaintiff did allege that her colleagues had not been observed as closely as she by Brinkman (Compl. (dkt. #1) 4), plaintiff did not provide *any* information establishing that they were either similarly situated or outside her protected classes. *See Peele*, 288 F.3d at 330 (explaining that "a *plaintiff must show that [she] is similarly situated with respect to performance, qualifications, and conduct*" (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612,

---

[15] The court need not determine whether the discipline resulting from the marriage conversation constitutes an adverse employment action because there is no credible evidence that it was a basis for her termination. Specifically, that discipline was issued in August 2013, meaning it could not have been one of the six disciplines within six months of June 13, 2014, that would have led to termination. (*See* Coleman Disciplinary History Pt. 3 (dkt. #13-9) 1, 5, 7.) "An adverse employment action must be materially adverse"; that is, it must "significantly alter[] the terms and conditions of the employee's job." *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004) (internal citations omitted) (affirming grant of summary judgment in age discrimination suit because plaintiff had "suffered no materially adverse employment action"). "'[N]ot everything that makes an employee unhappy is an actionable adverse action.'" *Oest v. Ill. Dept. of Corrections*, 240 F.3d 605, 613 (7th Cir. 2001) (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996)) (concluding negative performance evaluations, and oral and written reprimands alone were not actionable adverse employment actions), *overruled on other grounds by Ortiz*, 834 F.3d at 765. Further, "unfair reprimands or negative performance evaluations, unaccompanied by some tangible job consequence, do not constitute adverse employment actions." *See Grube v. Lau Inds., Inc.*, 257 F.3d 723, 729 (7th Cir. 2001) (internal citations omitted) (affirming summary judgment in sex discrimination suit in part because plaintiff had not suffered an adverse employment action).

617 (7th Cir. 2000)) (emphasis and alteration in original)). Likewise, defendant has shown that plaintiff was not the only employee disciplined for abusing time, even if plaintiff received more reprimands than her colleagues. (*See* Discipline Review Chart (dkt. #13-25) 2-3.) Accordingly, defendant is entitled to summary judgment on plaintiff's discrimination claims.

## II. Retaliation

Next, plaintiff claims that she was retaliated against for opposing unlawful discrimination. In Title VII jurisprudence, plaintiff can prevail on a claim of retaliation by proving that she: "(1) opposed an unlawful employment practice under Title VII; (2) was the object of an adverse employment action; and (3) the adverse employment action was caused by her opposition to the unlawful employment practice." *Congleton v. Oneida Cty.*, No. 16-cv-412-wmc, 2017 WL 4621117, at *16 (W.D. Wis. Oct. 13, 2017) (citing *Cullom v. Brown*, 209 F.3d 1035, 1040 (7th Cir. 2000)).[16] Again, plaintiff cannot meet her burden.

The only "retaliation" she clearly alleges is being ignored and then yelled at by Steve Brinkman more than four years after she complained about him calling her "lazy."[17]

---

[16] Unlike plaintiff's other asserted causes of action, which rely on Title VII's standards, there is no retaliation claim under the Equal Protection Clause. *Congleton v. Oneida Cty.*, 2017 WL 4621117, at *17-*18 (citing *Tate v. Ancell*, 551 Fed. Appx. 877, 898 (7th Cir. 2014); *Boyd v. Ill. State Police*, 384 F.3d 888, 898 (7th Cir. 2004); *Grossbaum v. Indianapolis-Marion Cnty. Bldg. Auth.*, 100 F.3d 1287, 1296 n.8 (7th Cir. 1996); *Gray v. Lacke*, 885 F.2d 399, 414 (7th Cir. 1989)).

[17] Plaintiff specifically alleges that "retaliation ha[d] become present, in my employ with the City . . . . Some decisions [Brinkman] made toward my employ were based on retaliation, because I exposed his opinion of me . . . when he made that expression toward me he exposed his bias opinion of the fact, that I'm a female, African American, and aging, while employed with Metro-Ride." (Compl. (dkt. #1) 7 (capitalization altered and typographical errors removed).) However, in her deposition, Coleman's only discussion of retaliation related to Brinkman yelling at her following her complaint about his calling her "lazy." (*See* Coleman Dep. (dkt. #14) 21:14-22:4, 42:17-43:10, 52:20-54:6, 58:9-23, 76:6-22.)

Setting aside plaintiff's acknowledgement that "lazy" by itself is "not a racial comment" (Coleman Dep. (dkt. #14) 46:10-13), and assuming that being ignored and then yelled at once altered the conditions and terms of her employment, the length of time between these incidents is too long to infer retaliation. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001) (per curiam) (concluding that a gap of 20 months between protected activity and adverse action "suggests, by itself, no causality at all").[18] Indeed, plaintiff's only support for the retaliation claim is this sequence of events: she reported Brinkman's comment, and more than four years later, he ignored and yelled at her. (*See* Coleman Dep. (dkt. 314) 42:17-43:11 (testifying that she considered the yelling incident to have "been based on that initial complaint" about Brinkman calling her "lazy").) Accordingly, among other things, plaintiff has not established a causal connection between protected activity and adverse employment action sufficient for a reasonable jury to find retaliation.

**III. Hostile Work Environment Claim**

Plaintiff also appears to allege a hostile work environment. (*See* Compl. (dkt. #1) 7 ("workforce harassment . . . ha[d] become present, in my employ with the City . . . . Through my employment with Metro-Ride[,] Steve Brinkman used his position to employ his deep seeded opinion of me . . . ." (capitalization altered and typographical errors removed)).) To avoid summary judgment on a hostile work environment claim, a plaintiff must establish four elements: "(1) the work environment must have been both subjectively and objectively offensive; (2) her [protected status] must have been the cause of the

---

[18] Plaintiff does not appear to complain that being more closely monitored was retaliation and, in fact, acknowledges that the discipline she received for coming in late was not discriminatory. (Coleman Dep. (dkt. #14) 60:4-10.)

15

harassment; (3) the conduct must have been severe or pervasive; and (4) there must be a basis for employer liability." *Orton-Bell v. Ind.*, 759 F.3d 768, 773 (7th Cir. 2014) (quoting *Chaib v. Indiana*, 744 F.3d 974, 985 (7th Cir. 2014)).[19] Here plaintiff has offered insufficient evidence for a reasonable trier of fact to find any of these elements. First, as an objective matter, a reasonable person would not find her work environment to be unreasonably, nor severely or pervasively, offensive -- even considering the combination of Brinkman's comment about her work ethic, her disciplinary history, and the scrutiny she faced. *See Kampmier v. Emeritus Corp.*, 472 F.3d 930, 941 (7th Cir. 2007) ("Courts look to several factors to determine whether alleged harassment is objectively offensive, including the frequency of the conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with the alleged victim's work performance." (citing *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 806-07 (7th Cir. 2000))); *compare Orton-Bell*, 759 F.3d at 775-76 (reversing summary judgment on hostile work environment claim based on evidence of a "constant barrage of sexually charged comments . . . clearly pervasive, offensive, and based on [plaintiff's] sex," such that there was "enough evidence for a jury to find that it was severe, subjectively offensive") *with Yuknis v. First Student, Inc.*, 481 F.3d 552, 553 (7th Cir. 2007) (explaining that a plaintiff cannot establish a hostile work environment claim where "'the alleged harassing conduct is too tepid or intermittent or equivocal to make a reasonable person believe that she has been discriminated against on the basis of her sex.'" (quoting *Galloway*

---

[19] While it is unclear if plaintiff is alleging a hostile work environment claim under Title VII or the Equal Protection Clause, the distinction is again irrelevant because the Title VII standard applies to equal protection claims for hostile work environment. *See McPhaul*, 226 F.3d at 566 n.6.

16

*v. General Motors Service Parts Operations,* 78 F.3d 1164, 1168 (7th Cir. 1996))). Here, plaintiff offers a few, isolated comments or actions by a single co-worker divided by substantial periods of time. Even if one could infer that racism, sexism, or religious prejudice motivated these comments or actions, it is not enough for this court to find the conduct objectively offensive to a reasonable person, nor could a reasonable jury find this isolated behavior severe or pervasive as to make her workplace to be subjectively offensive.[20] Accordingly, the court will grant summary judgment on this claim as well.

**IV. Due Process Claims**

Finally, plaintiff raises due process claims, essentially arguing that she was not given an opportunity to defend herself and she should have been provided an attorney to aid her defense. As an initial matter, contrary to defendant's contention that this was not raised in her complaint (Reply (dkt. #17) 4), plaintiff alleged that "all employees have the rights to legal representation, the Local Union ATA 1168 was not notified of this decision and therefore I was not able to exhibit my rights" and "the City of Wausau and Metro-Ride did not follow procedure by violating my opportunity to defend and protect my position [because] Metro-Ride did not notify the Local Union that they had made the decision to terminate my employment" (Compl. (dkt. #1) 8 (capitalization altered)). While defendant did not seek summary judgment on this claim, the court has the discretion to dismiss this claim as well where it appears there is no fact or law supporting it, after giving

---

[20] In fairness, Coleman testified at her deposition that about a year after she began working, a mechanic smacked her rear; she then went to management; and she was informed it was "taken care of." (Coleman Dep. (dkt. #14) 26:14-27:4.) While offensive and disturbing, even this over sexism is not enough by itself to find the City had created a hostile work environment some ten years later.

plaintiff a reasonable opportunity to respond.  *See* Fed. R. Civ. P. 56(f).

To establish a procedural due process claim, plaintiff "must show that the State deprived [her] of a protected liberty or property interest and that the deprivation occurred without adequate due process." *Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 926 (7th Cir. 2007) (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569 (1972)).  Procedural due process requires "'some form of hearing . . . before an individual is finally deprived of a property interest.'" *Alexander v. Wis. Dept. of Health and Fam. Servs.*, 263 F.3d 673, 688 (7th Cir. 2001) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).  This "hearing must provide the opportunity to be heard at a meaningful time and in a meaningful manner," but "the precise form and extent of process required in a particular situation will vary" based on the circumstances.  *Id.* (internal quotation marks and citations omitted). "[W]here adequate post-deprivation procedures are available, an individual with a property interest in his continued employment is entitled only to minimal predeprivation process: 'oral or written notice of the charges against [her], an explanation of the employer's evidence, and an opportunity to present [her] side of the story.'" *Salas*, 493 F.3d at 927 (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985)).

As a preliminary matter, it is unclear whether plaintiff had a property interest in her continued employment at Metro Ride.  "To have a property interest in public employment, a person must have more than a unilateral expectation of continuing in the job, . . . she must have 'a legitimate claim of entitlement' to the job." *McMillian v. Svetanoff*, 878 F.2d 186, 191 (7th Cir. 1989) (quoting *Roth*, 408 U.S. at 577).  Even assuming plaintiff did have such a property interest through her Union contract or otherwise, however, she likely still cannot establish a due process violation.  First, in an April 2014 meeting, plaintiff was

given notice that any further discipline would result in her termination. (*See* Coleman Dep. (dkt. #14) 36:14-18; *see also* Disciplinary History Pt. 3 (dkt. #13-9) 6 (Burek Meeting Notes).) Second, on June 3, plaintiff received two disciplinary notices informing her of her discharge after discovering she continued to work with a suspended commercial driver's license, both because that violation exceeded her "accumulation of formal disciplines in less than a six[] month period" and because of the "very large liability" to which she exposed Metro Ride by failing to report her suspended license. (Disciplinary History Pt. 3 (dkt. #13-9) 3, 5.) Coleman appears to have admitted that she "received the letter [notifying her of her suspended license] on Friday May 23, 2014." (*See id.* at 3.)

Still, she seems to complain that she did not get a full-fledged hearing before the human resources department and that the Union was not notified before she was fired. (Compl. (dkt. #1) 8.) The court is highly skeptical that this would constitute a due process violation, particularly since the governing CBA gave Metro Ride "the sole right to operate its operations," including to discipline or discharge "employees for just cause" and to "take whatever action [is] necessary to comply with State and Federal Law." (CBA (dkt. #13-6) 6-7.) Regardless, the record demonstrates that plaintiff received significant, post-termination due process: the Union filed and twice appealed a grievance on her behalf. Only then did *the Union* vote against continuing. Finally, as to her allegation that she had a right to a Union-provided lawyer -- assuming that she did have such an entitlement -- that would be a claim against the Union, not her former employer.

For these reasons, the court believes that the City is entitled to summary judgment on plaintiff's due process claims as well. However, the court cannot grant summary judgment on its own motion without first "giving notice and a reasonable time to respond."

19

Fed. R. Civ. P. 56(f). Accordingly, plaintiff may have until July 11, 2018, to marshal her admissible evidence -- possibly in the form of a declaration or an affidavit -- showing why defendant is not entitled to summary judgment on her remaining due process claims.

ORDER

IT IS ORDERED that:

1) Defendant's motion for partial summary judgment (dkt. #10) is GRANTED. Plaintiff's discrimination, hostile work environment, and retaliation claims are dismissed.

2) Plaintiff may have until July 11, 2018, to respond why the court should not grant summary judgment to defendant on her remaining due process claims.

3) All other deadlines in this case, including the trial date of July 9, 2018, are STRUCK, and will be reset if necessary after receipt of plaintiff's response.

Entered this 18th day of June, 2018.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge